In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

## NO. 09-13-00463-CV
_____


## IN THE INTEREST OF T.S. AND T.S.

**On Appeal from the 317th District Court**
**Jefferson County, Texas**
**Trial Cause No. C-215,575**

## MEMORANDUM OPINION

This is a parental-rights termination case. Following a bench trial, the trial court rendered an order that terminated Mother's parent-child relationships to two of her five children, her nine-year-old daughter, Anita, and her two-year-old son, Rusty.[1] The trial court found, by clear and convincing evidence, that statutory

---

[1]Because the children have identical initials in this parental-rights termination case and to protect their identities, we identify the two minors who are the subjects of the order by using pseudonyms. *See* Tex. R. App. P. 9.8. The parent-child relationships between Mother and three of her other children were not terminated; but, with respect to those three children, the trial court appointed their respective fathers as their managing conservator. Mother has not challenged the

1

grounds existed for each of the terminations, and found that terminating each of the parent-child relationships would be in Anita's and Rusty's best interest. *See* Tex. Fam. Code Ann. § 161.001 (1)(D), (E), (O), (2) (West Supp. 2013). Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's findings. We hold the evidence is sufficient to support the trial court's order, and we affirm the judgment.

Standard of Review

In a legal sufficiency review of an order terminating parental rights, the evidence relating to a challenged finding is reviewed "in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). With respect to Mother's factual sufficiency arguments, we must "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id.* Under a factual sufficiency standard, the trial court's findings are sufficient unless, based on the entire record, the disputed evidence that could not have been credited in favor of the finding is so significant

---

respective fathers' appointments as managing conservators in this appeal. Additionally, after this termination case commenced, Mother gave birth to a sixth child. Her sixth child was not subject to the proceedings that are now on appeal.

that the trial court could not have reasonably formed a firm belief or conviction that the challenged finding was true. *See id.*

Background

Several hours after Mother failed to return home after leaving to run errands, Mother's six-year-old son called 911. When the police arrived, there were three minor males in the home, a ten-year-old, a six-year-old, and a ten-month-old infant.[2] No adults were present.

Around 8:00 p.m. that evening, approximately five hours after leaving three of her children at home, Mother returned. During the termination hearing, Mother admitted that she left her three sons at home without supervision for approximately five hours while she ran errands.

This was not the first time Mother left several of her children at home for an extended period without proper supervision; during the trial, Mother acknowledged that in 2010, the Department had removed her children from her home after she left some of them at home without proper supervision. Mother acknowledged that after the children were removed in 2010, she had a discussion with the Department's caseworker about not leaving them without supervision again.

---

[2]Mother took Anita with her, but she left Rusty, who was then ten months old, with his two older brothers.

The second removal due to lack of appropriate supervision in the home occurred in 2012. During the termination hearing that is the present subject of Mother's appeal, Mother claimed that she left the children in 2012 to run errands, although she acknowledged that she had been hesitant to do so. Mother testified that she intended to find a vehicle large enough for all of her children, and she thought that if she could find one, she would not have to leave them alone again. When the trial occurred, approximately fifteen months after the trial court had placed the children in the Department's temporary custody, Mother testified that she had not yet found a suitable vehicle to take all of her children with her when she needed to run errands.

Failure to Comply with Court Order

In part, the trial court's termination order is based on Mother's failure to comply with the provisions of a court order that established what she was required to do to have her children returned to her. *See* Tex. Fam. Code Ann. § 161.001(1)(O). Mother does not contest that following the 2012 removal, the trial court issued an order establishing the actions she was required to follow to get her children back.[3] *See id.* Instead, Mother raises legal and factual sufficiency issues

---

[3]Nor does Mother argue that the children were not in the Department's custody for at least nine months as a result of the removal at issue. *See* Tex. Fam. Code Ann. § 161.001(1)(O).

that assert the State failed to prove, by clear and convincing evidence, that she had not complied with the provisions of the trial court's order that established what was required of her to get her children back.

According to Mother, the evidence shows that she made every reasonable effort to comply with the service plan. The testimony indicates that under the family service plan, Mother was required to complete a psychological evaluation, receive psychological counseling, obtain stable housing, visit the children, complete a drug assessment and random drug screens, and comply with conditions of a community supervision order that related to Mother's 2009 indictment for committing aggravated assault with a deadly weapon.

The Department responds to Mother's legal and factual sufficiency arguments by pointing to the evidence in the record that supports the trial court's conclusions that Mother failed to timely complete her individual counseling, follow the recommendations from her psychological and psychiatric evaluations, follow all requirements of the terms of her probation, and obtain and maintain a stable home.

With respect to Mother's psychological evaluation, the evidence before the trial court reflects that Mother missed her initial appointment for a psychological evaluation. Although Mother subsequently completed her psychological

evaluation, she completed that task approximately six weeks late. During the hearing, the Department's caseworker, Samantha Myers, testified that Mother had been diagnosed with intermittent explosive disorder, and she stated that Mother's records reflect that Mother had exhibited homicidal ideation. The report of Mother's psychological evaluation was admitted during the trial; it contains the psychologist's diagnostic impression that Mother was suffering from a delusional disorder (persecutory type, without good prognostic features), possible cyclothymic disorder (rapid mood swings), and personality disorder (not otherwise specified, with schizoid, histrionic, and antisocial features). The psychologist who performed the evaluation recommended that (1) a therapist investigate Mother's possible homicidal ideation due to the significant levels of aggression that she had reported; (2) a therapist help Mother learn stress reduction techniques; (3) Mother learn to develop and choose among alternative ways of thinking, feeling, and behaving; (4) Mother requires extensive "value adjustment work" because she lacked knowledge of normal societal conventions; (5) a therapist be used to encourage Mother to be responsible and accountable for her actions; and, (6) Mother learn social skills to replace the skills she currently uses, as environmental support and external structures are vital to deter Mother's behavior since her

6

problems appear to be firmly entrenched. The report concludes that the likelihood of Mother making major changes in her life is very slim.

Other evidence introduced during the hearing addressed whether Mother had received the various types of counseling required by her family service plan. According to Myers, Mother attended a single session of family based safety services. During that session, the services provider reported that Mother had exhibited volatile behavior. The services provider reported to Myers that she was not willing to continue providing services for Mother.

Mother also attended five counseling sessions with a licensed professional counselor. The notes from these sessions were admitted without objection. The notes of the first session reflect that Mother told the counselor that she wanted to get her children back, and that Mother acknowledged she needed to obtain housing, complete anger management classes, and attend counseling sessions. The counselor noted that Mother was serving a ten-year probationary period for stabbing her boyfriend with a knife. The counselor also noted that Mother had recently married a man after dating him for three months, and that during the first month of their marriage, Mother had a few verbal disagreements with her husband. According to the counselor's first note, Mother had begun to consider how she

could handle her anger and to understand that she needed to keep her children safe at all times.

The notes from the second counseling session reveal that Mother and her husband had a major conflict "due to her being oversensitive regarding a specific incident that occurred earlier today." Mother indicated to the counselor that she understood how she could have better handled her anger, and Mother discussed with her counselor possible strategies designed to reduce Mother's anger level, including using deep breathing exercises.

At the third counseling session, the counselor noted that Mother was pregnant. Mother reported that she and her husband were excited about the baby. Mother agreed that she needed to obtain a residence for her family, but she indicated to the counselor that she was not employed.

During the fourth session, Mother reported that due to her husband's use of mood altering chemicals, they were experiencing discord. The counselor's notes reflect that following an argument that occurred at three o'clock in the morning, Mother and her husband had been evicted from their efficiency apartment. Mother advised the counselor that she planned to pursue a divorce, and that she was residing in a church member's home.

The counselor's progress notes from the final session of February 4, 2013, indicate that Mother and her husband had received spiritual counseling and reconciled, and that her husband had obtained a home. The counselor noted that Mother continued to reflect on her role in the conflict, how she might have been selfish, and how to avoid being selfish.

Regarding whether Mother kept her appointments, Myers testified that Mother had missed some of her appointments, and despite having been in counseling for a year, Mother failed to complete it. Myers further explained that Mother's counselor reported to her that Mother had not made any significant progress in counseling and "that there was nothing further that she could do." Relying on the information that Mother's counselor had provided, and her experience that most of the Department's clients complete counseling in three to six months, Myers advised Mother that the Department would no longer pay for counseling; however, Myers encouraged Mother to continue with counseling on her own. Mother's counselor agreed to update Myers if she provided Mother with additional counseling.

Although Mother testified that she saw the counselor after February 2013, she could not explain how many additional sessions she attended or when those sessions occurred. The counselor's records do not show that Mother received any

further counseling. Mother also testified that her church gave her counseling as often as she felt she needed it, but Mother's pastor, who also testified at the termination hearing did not state that Mother had received psychological counseling through the church.

With respect to housing, the evidence shows that Mother resided in several places after her children were removed. According to Myers, Mother never located appropriate housing as required by the service plan. Although Myers indicated that she knew Mother's husband had recently purchased a home, Myers stated that Mother separated from her husband after one month of marriage. Myers was also aware that as of the date of the hearing, Mother was living in a women's and children's shelter. Additionally, there was evidence introduced at the hearing that Mother's caseworker from the women's shelter was unaware that Mother was serving community supervision based on a charge of aggravated assault; the caseworker's testimony creates some doubt about whether Mother, given her history of family violence, can continue to reside at the shelter. According to Myers, Mother "never had a housing location that [the Department] would put the children back in."

With respect to future housing, the evidence showed that Mother was still attempting to obtain suitable housing as of the trial date, fifteen months after the

removal. Mother testified that the week before the hearing she leased a three bedroom apartment. Myers denied that she was aware that Mother had leased an apartment. Mother did not produce the lease during the termination hearing. Viewed in the light most favorable to the trial court's findings, the evidence allowed the trial court to reasonably conclude that Mother had not obtained suitable housing for her children by the deadline established in the family service plan.

With respect to whether Mother complied with the requirement of her community supervision order, the evidence at the termination hearing showed that a criminal court had placed Mother on community supervision. The evidence at the termination hearing shows that Mother had been indicted in October 2009 for stabbing a man with a knife. In November 2010, Mother admitted her guilt and received deferred adjudication. Under the criminal court's community supervision order, Mother was ordered to "not associate with any disreputable person[.]" Under the terms of her family service plan, Mother was required to comply with the requirements that were placed on her by the community supervision order. While subject to the terms of the community supervision order and the family service plan, Mother met the man that she then married. According to Myers, Mother's

11

husband is a parolee with an extensive criminal background.[4] According to Myers, Mother was aware that the man she chose to marry was on parole when the marriage occurred. During the termination hearing, Mother claimed she was unaware of the extent of her husband's criminal record when she married him. Myers did acknowledge that Mother might not have been aware of all of her husband's criminal history when she decided to marry him; nevertheless, based on the evidence before it, the trial judge could have reasonably concluded that even if Mother did not know the entire extent of her husband's criminal record, she knowingly associated with a person that had a criminal record in violation of her community supervision order and her family service plan.

While Mother presented a number of excuses to justify her noncompliance with her court-ordered family service plan, the issue for the trial court at the termination hearing was whether Mother complied with its order; the question was not whether Mother substantially complied or presented excuses for her non-compliance. *See In re I.G.*, 383 S.W.3d 763, 771 (Tex. App.—Amarillo 2012, no pet.); *In re J.S.*, 291 S.W.3d 60, 67 (Tex. App.—Eastland 2009, no pet.). The excuses on which Mother relied to justify her non-compliance with her family

---

[4]During a preliminary hearing, the trial court noted that the husband's criminal record included "aggravated offenses, weapons, robbery, giving false information, resisting arrest, trespass, theft, [and] marijuana." According to Myers, the man Mother married had a rap sheet that was twenty-three pages long.

service plan are relevant only to the trial court's best interest determination. *See In re M.C.G.*, 329 S.W.3d 674, 675-76 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (supp. op. on reh'g).

Citing *In re J.R.*, Mother contends her failure to complete her family service plan cannot justify a finding under section 161.001(1)(O) in the absence of evidence that she had engaged in conduct that endangered the physical or emotional well-being of the children. *See* 171 S.W.3d 558 (Tex. App.—Houston [14th Dist.] 2005, no pet.). However, the grounds for termination under review in *In re J.R.* were sections 161.001(1)(D), which requires a showing that the conditions or surroundings endangered the physical or emotional well-being of the child, and 161.001(1)(E), which requires evidence that the child was placed with a person who endangered the physical or emotional well-being of the child. *Id.* at 568. In other words, the trial court did not terminate the parent-child relationship in *In re J.R.* based on section 161.001(1)(O), but the Fourteenth Court of Appeals did review the parents' failure to provide stable housing in evaluating whether there was "legally sufficient evidence to support an implied finding under subsections 161.001(1)(D) and (E) based on this conduct." *Id.* at 577.

We conclude that because *In re J.R.* is a case that did not depend on a termination finding under 161.001(1)(O), it is inapposite. While the State must

13

show the removal of the children occurred due to abuse or neglect to justify termination under section 161.001(1)(O), subsection O does not require the State to prove the children were actually endangered. *Compare* Tex. Fam. Code Ann. § 161.001(1)(O), *with id.* § 161.001(1)(D), (E); *see also In re E.C.R.*, 402 S.W.3d 239, 246-47 (Tex. 2013). In her appeal, Mother has not challenged the trial court's finding that the children were removed based on her neglect.

From the arguments presented in Mother's appeal, we are also not persuaded that the evidence supporting the trial court's subsection 161.001(1)(O) finding is factually insufficient. With respect to Mother's testimony that she had recently leased an apartment, the trial court could have disbelieved her; no objective evidence, such as a lease, was produced during the hearing to show that Mother had secured a suitable home for her children. Further, a caseworker at the women's shelter testified that it was not normal for the shelter to house a perpetrator of domestic violence, and she further testified that she was unaware that Mother was alleged to have problems with anger management and that she was not being treated for her mental health issues. The trial court could have reasonably chosen to reject Mother's claim that the shelter represented stable housing when the record does not reflect that Mother will be allowed to continue living there.

With respect to Mother's factual sufficiency argument, the evidence which Mother contends that a reasonable factfinder could not have credited is not so significant that a factfinder could not have formed a firm belief or conviction that Mother failed to comply with the provisions of a court order that specifically established the actions she was required to take to have Anita and Rusty returned to her. *See In re J.F.C.*, 96 S.W.3d at 266. We conclude that the trial court's termination findings based on subsection 161.001(1)(O) are supported by sufficient evidence. *See* Tex. Fam. Code Ann. § 161.001(1)(O).[5] We overrule issue one.

In light of our disposition of issue one, reviewing issues two and three would not afford Mother any relief. Therefore, it is not necessary that we address issues two and three to resolve Mother's appeal. *See* Tex. R. App. P. 47.1.

Best Interest

In issue four, Mother argues that the evidence is insufficient to support the trial court's best interest findings. With respect to determining what is in a child's best interest, a trial court begins its analysis with a "strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *see* Tex. Fam. Code Ann. § 153.131 (West 2008).

---

[5]A single predicate finding under section 161.001(1) of the Texas Family Code will support a judgment of termination when there is also a finding that termination is in the best interest of the children under section 161.001(2). *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

15

Nevertheless, a competing presumption exists, as a prompt and permanent placement of children in a safe environment is also in their best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). In reviewing the trial court's best interest determinations regarding Anita and Rusty, we consider the *Holley* factors, consisting of:

(1) each child's desires;

(2) each child's emotional and physical needs now and in the future;

(3) any emotional and physical danger to each child now and in the future;

(4) the parental abilities of those individuals asking the trial court for custody;

(5) the programs to promote the best interest of the respective children that were available to assist the individuals asking the trial court for custody;

(6) the plans for the respective children by the individuals or agency seeking custody;

(7) the stability of the home or the proposed placement;

(8) the parent's acts or omissions which may indicate that the existing parent-child relationships are improper; and

(9) any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see* Tex. Fam. Code Ann. § 263.307(b).

When the termination hearing occurred, Anita was nine years old and Rusty was two. The evidence before the trial court includes Mother's psychological evaluation, and it reflects on Mother's capability to parent. Mother's psychological testing indicates that she had been diagnosed with significant problems that affected her ability to function normally on a daily basis and that her problems were unlikely to change.

In considering what was in Anita's and Rusty's best interest, the trial court could also consider whether Mother had demonstrated that she had the ability to obtain and maintain safe housing for them. Over the period that the children were in the Department's custody, Mother appears to have lived in four places, and her recent marriage appears to have introduced additional instability into her living arrangements. Although the terms of Mother's community supervision prohibited her from associating with persons of ill repute, the evidence was undisputed that she married a man who was on parole and then had a child with him. There was evidence that Mother's husband had a lengthy criminal history, that his drug use had been a disruptive factor during their marriage, and that Mother's husband verbally abused her to such an extent that she left him and was living in a shelter. Yet, as of the date of the termination hearing, Mother was not yet divorced. Myers testified that she was concerned that Mother was cycling between accusing her

17

husband of improper behavior and then returning to him. It was reasonable for the trial court to consider the additional instability of Mother's recent marriage in evaluating Mother's current and future capability of the requirement that she obtain and maintain safe housing for her children.

Given the testimony of Mother's psychological makeup, the trial court could also consider Mother's history of domestic violence in reaching its best interest determinations. Before Mother's parenting issues first came to the Department's attention, the evidence showed that in 2009, Mother stabbed her boyfriend in the abdomen while one of her children was present. According to Mother, she stabbed her boyfriend after finding another woman's phone number in his phone. The judge, given the Mother's plea of guilty and her statement to police about the incident when it occurred, could reasonably reject Mother's claim that the stabbing occurred due to her accidental reaction to being grabbed while holding a knife. Although Mother's family service plan required her to maintain appropriate housing, there was evidence of a chaotic home environment surrounding the homes Mother had provided in the past, evidence that she had not maintained safe housing during the removal that led to the proceedings at issue, and evidence showing that Mother had not yet secured appropriate housing for the children as of the date of the termination hearing. We conclude the evidence is sufficient to support the trial

18

court's finding that Mother had not and would not in the future provide Anita or Rusty a stable home.

In considering Anita's and Rusty's emotional needs, and although Mother disputed the Department's evidence, there is evidence from which the trial court could have reasonably concluded that Mother had not completed the counseling required by her family service plan. The trial court could have also concluded that when her Department-provided counseling ended, Mother did not pursue further psychological counseling, and on this record it could reasonably reject her unsupported testimony that she had gotten additional counseling. Mother's failure to obtain the types of tools she needed as described in her psychological evaluation that would have allowed her to adjust the types of behavior she had exhibited with respect to her children is evidence the trial court could reasonably have considered in making its determination that Mother did not have the skills she needed to meet her children's emotional needs. Despite Mother's apparent lack of parenting skills, there was evidence that Mother had bonded with her children, and she visited them regularly while they were in foster care. Although the evidence regarding whether Mother met the emotional needs of her children was disputed, there is evidence supporting the trial court's conclusion that over the long run, she would not adequately do so.

The evidence that Mother had previously neglected her children by leaving them without proper supervision is also an act that the trial court could have reasonably considered as showing that Mother's relationship with her children was improper. The testimony established that the Department temporarily removed Mother's children from her custody in 2010 because she left them unattended for hours. Although Mother claimed that she had learned from that experience that she could not leave her oldest son in charge of his younger siblings, she did so again in April 2012. Mother's excuse for leaving the children at home in 2012 was that she needed to find a vehicle and that it was raining so it was not practical to take all of the children with her. The trial court could have concluded that this excuse was unreasonable since the children had been previously removed when Mother left them without proper supervision, and Mother should have learned from that removal that it was improper to do so.

With respect to the desires of Anita and Rusty, Mother contends that the Department offered no proof that they did not desire to stay with her. Myers testified that Anita expressed a desire to continue seeing Mother and to remain with her siblings; however, there was also testimony that the children were in a stable placement and they were happy. The evidence further showed that an adoptive home for Anita and Rusty had been found recently, that Anita and Rusty

20

appeared to be happy there, and that the foster parents were willing to keep in touch with Anita's and Rusty's other siblings. Although Anita initially had a difficult time in earlier placements, there was evidence showing that she had adjusted to her new foster parents and was behaving well there.

With respect to Mother's parenting ability, Mother argues that Anita and Rusty do not have special needs, that she attempted to improve her parenting skills through courses at the women's shelter, and that by participating in counseling at her church, she can provide stable housing. Mother concludes the Department has not shown that she will endanger her children again in the future. On Mother's behalf, Mother's caseworker from the women's shelter testified that Mother attends parenting groups regularly, and that Mother has not been observed having any anger problems.

In response, the Department argues that Mother's psychological evaluation reveals problems with her cognitive organization, and these problems cause Mother to be impulsive. Additionally, the Department notes that Mother failed to complete counseling services, and that Mother had not demonstrated that she could maintain a stable home. The trial court could have discounted the weight of the testimony of Mother's caseworker from the shelter, as the caseworker acknowledged that she was unaware that Mother was on community supervision

21

for aggravated assault, that persons with histories of domestic violence are generally not allowed to live at the shelter, and that Mother was not receiving any psychological treatment or counseling through the shelter. The evidence in the record on Mother's parenting abilities and skills is conflicting, but it was up to the trial court to weigh the existing evidence and determine what to believe. *See In re J.F.C.*, 96 S.W.3d at 266.

According to Mother, in making its best interest determination, the trial court should have considered her recent pregnancy to excuse her failure to comply with the requirements of her family service plan. But, given the evidence of Mother's psychological problems and in considering how those problems affected Mother's capacity to make good decisions as a parent, the trial court could have reasonably rejected Mother's claim that her pregnancy represented a valid excuse for Mother's failure to comply with the terms of her family service plan. *Id.*

Having considered the *Holley* factors, and the evidence before the trial court, we conclude the trial court could form a firm conviction or belief that Anita's and Rusty's best interests were served by terminating Mother's parental rights. *Id.* We overrule issue four, and we affirm the trial court's judgment.

22

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on January 6, 2014
Opinion Delivered April 10, 2014

Before McKeithen, C.J., Kreger and Horton, JJ.

23